(Slip Opinion)　　　　OCTOBER TERM, 2010　　　　1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* JICARILLA APACHE NATION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 10–382.　Argued April 20, 2011—Decided June 13, 2011

Respondent Jicarilla Apache Nation's (Tribe) reservation contains natural resources that are developed pursuant to statutes administered by the Interior Department. Proceeds from these resources are held by the United States in trust for the Tribe. The Tribe filed a breach-of-trust action in the Court of Federal Claims (CFC), seeking monetary damages for the Government's alleged mismanagement of the Tribe's trust funds in violation of 25 U. S. C. §§161–162a and other laws. During discovery, the Tribe moved to compel production of certain documents. The Government agreed to release some of the documents, but asserted that others were protected by, *inter alia,* the attorney-client privilege. The CFC granted the motion in part, holding that departmental communications relating to the management of trust funds fall within a "fiduciary exception" to the attorney-client privilege. Under that exception, which courts have applied to common-law trusts, a trustee who obtains legal advice related to trust administration is precluded from asserting the attorney-client privilege against trust beneficiaries.

　Denying the Government's petition for a writ of mandamus directing the CFC to vacate its production order, the Federal Circuit agreed with the CFC that the trust relationship between the United States and the Indian tribes is sufficiently similar to a private trust to justify applying the fiduciary exception. The appeals court held that the United States cannot deny a tribe's request to discover communications between the Government and its attorneys based on the attorney-client privilege when those communications concern management of an Indian trust and the Government has not claimed that it or its attorneys considered a specific competing interest in those communications.

Syllabus

*Held:* The fiduciary exception to the attorney-client privilege does not apply to the general trust relationship between the United States and the Indian tribes. Pp. 5–24.

   (a) The Court considers the bounds of the fiduciary exception and the nature of the Indian trust relationship. Pp. 5–14.

      (1) Under English common law, when a trustee obtained legal advice to guide his trust administration and not for his own defense in litigation, the beneficiaries were entitled to the production of documents related to that advice on the rationale that the advice was sought for their benefit and obtained at their expense in that trust funds were used to pay the attorney. In the leading American case, *Riggs Nat. Bank of Washington, D. C.* v. *Zimmer*, 355 A. 2d 709, the Delaware Chancery Court applied the fiduciary exception to hold that trust beneficiaries could compel trustees to produce a legal memorandum related to the trust's administration because: (1) the trustees had obtained the legal advice as "mere representative[s]" of the beneficiaries, who were the "real clients" of the attorney, *id.*, at 711–712, and (2) the fiduciary duty to furnish trust-related information to the beneficiaries outweighed the trustees' interest in the attorney-client privilege, *id.*, at 714. The Federal Courts of Appeals apply the fiduciary exception based on the same two criteria. Pp. 6–9.

      (2) The Federal Circuit analogized the Government to a private trustee. While the United States' responsibilities with respect to the management of tribal funds bear some resemblance to those of a private trustee, this analogy cannot be taken too far. The Government's trust obligations to the tribes are established and governed by statute, not the common law, see, *e.g., United States* v. *Navajo Nation*, 537 U. S. 488, 506 *(Navajo I),* and in fulfilling its statutory duties, the Government acts not as a private trustee, but pursuant to its sovereign interest in the execution of federal law, see, *e.g., Heckman* v. *United States*, 224 U. S. 413, 437. Once federal law imposes fiduciary obligations on the Government, the common law "could play a role," *United States* v. *Navajo Nation*, 556 U. S. ___, ___ *(Navajo II); e.g.,* to inform the interpretation of statutes, see *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465, 475–476. But the applicable statutes and regulations control. When "the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter." *Navajo II, supra,* at ___. Pp. 9–14.

   (b) The two criteria justifying the fiduciary exception are absent in the trust relationship between the United States and Indian tribes. Pp. 14–23.

      (1) In cases applying the fiduciary exception, courts identify the

Syllabus

"real client" based on whether the advice was bought by the trust corpus, whether the trustee had reason to seek advice in a personal rather than a fiduciary capacity, and whether the advice could have been intended for any purpose other than to benefit the trust. *Riggs,* 355 A. 2d, at 711–712. Applying these factors, the Court concludes that the United States does not obtain legal advice as a "mere representative" of the Tribe; nor is the Tribe the "real client" for whom that advice is intended. See *id.*, at 711. Here, the Government attorneys are paid out of congressional appropriations at no cost to the Tribe. The Government also seeks legal advice in its sovereign capacity rather than as a conventional fiduciary of the Tribe. Because its sovereign interest is distinct from the beneficiaries' private interests, the Government seeks legal advice in a personal, not a fiduciary, capacity. Moreover, the Government has too many competing legal concerns to allow a case-by-case inquiry into each communication's purpose. In addition to its duty to the Tribe, the Government may need to comply with other statutory duties, such as environmental and conservation obligations. It may also face conflicting duties to different tribes or individual Indians. It may seek the advice of counsel for guidance in balancing these competing interests or to help determine whether there are conflicting interests at all. For the attorney-client privilege to be effective, it must be predictable. See, *e.g., Jaffee* v. *Redmond*, 518 U. S. 1, 18. The Government will not always be able to predict what considerations qualify as competing interests, especially before receiving counsel's advice. If the Government were required to identify the specific interests it considered in each communication, its ability to receive confidential legal advice would be substantially compromised. See *Upjohn Co.* v. *United States*, 449 U. S. 383, 393. Pp. 15–20.

(2) The Federal Circuit also decided that the fiduciary exception properly applied here because of the fiduciary's duty to disclose all trust-management-related information to the beneficiary. The Government, however, does not have the same common-law disclosure obligations as a private trustee. In this case, 25 U. S. C. §162a(d) delineates the Government's "trust responsibilities." It identifies the Interior Secretary's obligation to supply tribal account holders "with periodic statements of their account performance" and to make "available on a daily basis" their account balances, §162a(d)(5). The Secretary has complied with these requirements in regulations mandating that each tribe be provided with a detailed quarterly statement of performance. 25 CFR pt. 115.8. The common law of trusts does not override these specific trust-creating statutes and regulations. A statutory clause labeling the enumerated trust responsibilities as nonexhaustive, see §162a(d), cannot be read to include a gen-

Syllabus

eral common-law duty to disclose all information related to the administration of Indian trusts, since that would vitiate Congress' specification of narrowly defined disclosure obligations, see, *e.g., Mackey* v. *Lanier Collection Riggs Agency & Service, Inc.*, 486 U. S. 825, 837. By law and regulation, moreover, the documents at issue are classed "the property of the United States" while other records are "the property of the tribe." 25 CFR §115.1000. This Court considers ownership of records to be a significant factor in deciding who "ought to have access to the document," *Riggs, supra,* at 712. Here, that privilege belongs to the United States. Pp. 20–23.

590 F. 3d 1305, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, in which BREYER, J., joined. SOTOMAYOR, J., filed a dissenting opinion. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–382

## UNITED STATES, PETITIONER *v.* JICARILLA APACHE NATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[June 13, 2011]

JUSTICE ALITO delivered the opinion of the Court.

The attorney-client privilege ranks among the oldest and most established evidentiary privileges known to our law. The common law, however, has recognized an exception to the privilege when a trustee obtains legal advice related to the exercise of fiduciary duties. In such cases, courts have held, the trustee cannot withhold attorney-client communications from the beneficiary of the trust.

In this case, we consider whether the fiduciary exception applies to the general trust relationship between the United States and the Indian tribes. We hold that it does not. Although the Government's responsibilities with respect to the management of funds belonging to Indian tribes bear some resemblance to those of a private trustee, this analogy cannot be taken too far. The trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law, and in fulfilling its statutory duties, the Government acts not as a private trustee but pursuant to its sovereign interest in the execution of federal law. The reasons for the fiduciary exception—that the trustee has no independent inter-

est in trust administration, and that the trustee is subject to a general common-law duty of disclosure—do not apply in this context.

I

The Jicarilla Apache Nation (Tribe) occupies a 900,000-acre reservation in northern New Mexico that was established by Executive Order in 1887. The land contains timber, gravel, and oil and gas reserves, which are developed pursuant to statutes administered by the Department of the Interior. Proceeds derived from these natural resources are held by the United States in trust for the Tribe pursuant to the American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, and other statutes.

In 2002, the Tribe commenced a breach-of-trust action against the United States in the Court of Federal Claims (CFC). The Tribe sued under the Tucker Act, 28 U. S. C. §1491 (2006 ed. and Supp. III), and the Indian Tucker Act, §1505, which vest the CFC with jurisdiction over claims against the Government that are founded on the Constitution, laws, treaties, or contracts of the United States. The complaint seeks monetary damages for the Government's alleged mismanagement of funds held in trust for the Tribe. The Tribe argues that the Government violated various laws, including 25 U. S. C. §§161a and 162a, that govern the management of funds held in trust for Indian tribes. See 88 Fed. Cl. 1, 3 (2009).

From December 2002 to June 2008, the Government and the Tribe participated in alternative dispute resolution in order to resolve the claim. During that time, the Government turned over thousands of documents but withheld 226 potentially relevant documents as protected by the attorney-client privilege, the attorney work-product doctrine, or the deliberative-process privilege.

In 2008, at the request of the Tribe, the case was re-

stored to the active litigation docket.  The CFC divided the
case into phases for trial and set a discovery schedule.
The first phase, relevant here, concerns the Government's
management of the Tribe's trust accounts from 1972 to
1992.  The Tribe alleges that during this period the Gov-
ernment failed to invest its trust funds properly.  Among
other things, the Tribe claims the Government failed to
maximize returns on its trust funds, invested too heavily
in short-term maturities, and failed to pool its trust
funds with other tribal trusts.  During discovery, the Tribe
moved to compel the Government to produce the 226
withheld documents.  In response, the Government agreed
to withdraw its claims of deliberative-process privilege
and, accordingly, to produce 71 of the documents.  But the
Government continued to assert the attorney-client privi-
lege and attorney work-product doctrine with respect to
the remaining 155 documents.  The CFC reviewed those
documents *in camera* and classified them into five cate-
gories: (1) requests for legal advice relating to trust ad-
ministration sent by personnel at the Department of the
Interior to the Office of the Solicitor, which directs legal
affairs for the Department, (2) legal advice sent from the
Solicitor's Office to personnel at the Interior and Treas-
ury Departments, (3) documents generated under con-
tracts between Interior and an accounting firm, (4) Inte-
rior documents concerning litigation with other tribes, and
(5) miscellaneous documents not falling into the other
categories.

The CFC granted the Tribe's motion to compel in part.
The CFC held that communications relating to the man-
agement of trust funds fall within a "fiduciary exception"
to the attorney-client privilege.  Under that exception,
which courts have applied in the context of common-law
trusts, a trustee who obtains legal advice related to the
execution of fiduciary obligations is precluded from assert-
ing the attorney-client privilege against beneficiaries of

the trust. The CFC concluded that the trust relationship between the United States and the Indian tribes is sufficiently analogous to a common-law trust relationship that the exception should apply. Accordingly, the CFC held, the United States may not shield from the Tribe communications with attorneys relating to trust matters.

The CFC ordered disclosure of almost all documents in the first two categories because those documents "involve matters regarding the administration of tribal trusts, either directly or indirectly implicating the investments that benefit Jicarilla" and contain "legal advice relating to trust administration." *Id.*, at 14–15. The CFC allowed the Government to withhold most of the documents in the remaining categories as attorney work product,[1] but the court identified some individual documents that it determined were also subject to the fiduciary exception. *Id.*, at 18–19.

The Government sought to prevent disclosure of the documents by petitioning the Court of Appeals for the Federal Circuit for a writ of mandamus directing the CFC to vacate its production order. The Court of Appeals denied the petition because, in its view, the CFC correctly applied the fiduciary exception. The court held that "the United States cannot deny an Indian tribe's request to discover communications between the United States and its attorneys based on the attorney-client privilege when those communications concern management of an Indian trust and the United States has not claimed that the government or its attorneys considered a specific competing interest in those communications." *In re United States*, 590 F. 3d 1305, 1313 (CA Fed. 2009). In qualifying

––––––––––

[1] The CFC held that there is no fiduciary exception to the work-product doctrine. 88 Fed. Cl. 1, 12 (2009). The Court of Appeals did not address that issue, *In re United States*, 590 F. 3d 1305, 1313 (CA Fed. 2009), and it is not before us.

its holding, the court recognized that sometimes the Government may have other statutory obligations that clash with its fiduciary duties to the Indian tribes. But because the Government had not alleged that the legal advice in this case related to such conflicting interests, the court reserved judgment on how the fiduciary exception might apply in that situation. The court rejected the Government's argument that, because its duties to the Indian tribes were governed by statute rather than the common law, it had no general duty of disclosure that would override the attorney-client privilege. The court also disagreed with the Government's contention that a case-by-case approach made the attorney-client privilege too unpredictable and would impair the Government's ability to obtain confidential legal advice.

We granted certiorari, 562 U. S. ___ (2011),[2] and now reverse and remand for further proceedings.

## II

The Federal Rules of Evidence provide that evidentiary privileges "shall be governed by the principles of the common law . . . in the light of reason and experience." Fed. Rule Evid. 501. The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981) (citing 8 J. Wigmore, Evidence §2290 (J. McNaughton rev. 1961)). Its aim is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the obser-

———————

[2] After the Federal Circuit denied the Government's mandamus petition, the Government produced the documents under a protective order that prevents disclosure to third parties until the case is resolved by this Court. App. to Pet. for Cert. 93a–97a. The Government's compliance with the production order does not affect our review. Our decision may still provide effective relief by preventing further disclosure and by excluding the evidence from trial. See *Mohawk Industries, Inc.* v. *Carpenter*, 558 U. S. ___, ___ (2009) (slip op., at 8).

vance of law and administration of justice." 449 U. S., at 389; *Hunt* v. *Blackburn*, 128 U. S. 464, 470 (1888).

The objectives of the attorney-client privilege apply to governmental clients. "The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture." 1 Restatement (Third) of the Law Governing Lawyers §74, Comment *b,* pp. 573–574 (1998). Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys. *Id.*, at 574 ("[G]overnmental agencies and employees enjoy the same privilege as nongovernmental counterparts"). The Tribe argues, however, that the common law also recognizes a fiduciary exception to the attorney-client privilege and that, by virtue of the trust relationship between the Government and the Tribe, documents that would otherwise be privileged must be disclosed. As preliminary matters, we consider the bounds of the fiduciary exception and the nature of the trust relationship between the United States and the Indian tribes.

## A

English courts first developed the fiduciary exception as a principle of trust law in the 19th century. The rule was that when a trustee obtained legal advice to guide the administration of the trust, and not for the trustee's own defense in litigation, the beneficiaries were entitled to the production of documents related to that advice. *Wynne* v. *Humberston,* 27 Beav. 421, 423–424, 54 Eng. Rep. 165, 166 (1858); *Talbot* v. *Marshfield* 2 Dr. & Sm. 549, 550–551, 62 Eng. Rep. 728, 729 (1865). The courts reasoned that the normal attorney-client privilege did not apply in this situation because the legal advice was sought for the beneficiaries' benefit and was obtained at the beneficiar-

ies' expense by using trust funds to pay the attorney's fees. *Ibid.; Wynne*, *supra*, at 423–424, 54 Eng. Rep., at 166.

The fiduciary exception quickly became an established feature of English common law, see, *e.g.*, *In re Mason*, 22 Ch. D. 609 (1883), but it did not appear in this country until the following century. American courts seem first to have expressed skepticism. See *In re Prudence-Bonds Corp.*, 76 F. Supp. 643, 647 (EDNY 1948) (declining to apply the fiduciary exception to the trustee of a bondholding corporation because of the "important right of such a corporate trustee . . . to seek legal advice and nevertheless act in accordance with its own judgment"). By the 1970's, however, American courts began to adopt the English common-law rule. See *Garner* v. *Wolfinbarger*, 430 F. 2d 1093, 1103–1104 (CA5 1970) (allowing shareholders, upon a showing of "good cause," to discover legal advice given to corporate management).[3]

The leading American case on the fiduciary exception is *Riggs Nat. Bank of Washington, D. C.* v. *Zimmer*, 355 A. 2d 709 (Del. Ch. 1976). In that case, the beneficiaries of a trust estate sought to compel the trustees to reimburse the estate for alleged breaches of trust. The beneficiaries

---

[3] Today, "[c]ourts differ on whether the [attorney-client] privilege is available for communications between the trustee and counsel regarding the administration of the trust." A. Newman, G. Bogert & G. Bogert, Law of Trusts and Trustees §962, p. 68 (3d ed. 2010) (hereinafter Bogert). Some state courts have altogether rejected the notion that the attorney-client privilege is subject to a fiduciary exception. See, *e.g.*, *Huie* v. *DeShazo*, 922 S. W. 2d 920, 924 (Tex. 1996) ("The attorney-client privilege serves the same important purpose in the trustee-attorney relationship as it does in other attorney-client relationships"); *Wells Fargo Bank* v. *Superior Ct.*, 22 Cal. 4th 201, 208–209, 990 P. 2d 591, 595 (2000) ("[T]he attorney for the trustee of a trust is not, by virtue of this relationship, also the attorney for the beneficiaries of the trust" (internal quotation marks omitted)). Neither party before this Court disputes the existence of a common-law fiduciary exception, however, so in deciding this case we assume such an exception exists.

moved to compel the trustees to produce a legal memorandum related to the administration of the trust that the trustees withheld on the basis of attorney-client privilege. The Delaware Chancery Court, observing that "American case law is practically nonexistent on the duty of a trustee in this context," looked to the English cases. *Id.*, at 712. Applying the common-law fiduciary exception, the court held that the memorandum was discoverable. It identified two reasons for applying the exception.

First, the court explained, the trustees had obtained the legal advice as "mere representative[s]" of the beneficiaries because the trustees had a fiduciary obligation to act in the beneficiaries' interest when administering the trust. *Ibid.* For that reason, the beneficiaries were the "real clients" of the attorney who had advised the trustee on trust-related matters, and therefore the attorney-client privilege properly belonged to the beneficiaries rather than the trustees. *Id.*, at 711–712. The court based its "real client" determination on several factors: (1) when the advice was sought, no adversarial proceedings between the trustees and beneficiaries had been pending, and therefore there was no reason for the trustees to seek legal advice in a personal rather than a fiduciary capacity; (2) the court saw no indication that the memorandum was intended for any purpose other than to benefit the trust; and (3) the law firm had been paid out of trust assets. That the advice was obtained at the beneficiaries' expense was not only a "significant factor" entitling the beneficiaries to see the document but also "a strong indication of precisely who the real clients were." *Id.*, at 712. The court distinguished between "legal advice procured at the trustee's *own* expense and for his *own* protection," which would remain privileged, "and the situation where the trust itself is assessed for obtaining opinions of counsel where interests of the beneficiaries are presently at stake." *Ibid.* In the latter case, the fiduciary exception applied, and the

trustees could not withhold those attorney-client communications from the beneficiaries.

Second, the court concluded that the trustees' fiduciary duty to furnish trust-related information to the beneficiaries outweighed their interest in the attorney-client privilege. "The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship," the court explained, "is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust." *Id.*, at 714. Because more information helped the beneficiaries to police the trustees' management of the trust, disclosure was, in the court's judgment, "a weightier public policy than the preservation of confidential attorney-client communications." *Ibid.*

The Federal Courts of Appeals apply the fiduciary exception based on the same two criteria. See, *e.g.*, *In re Long Island Lighting Co.*, 129 F. 3d 268, 272 (CA2 1997); *Wachtel* v. *Health Net, Inc.*, 482 F. 3d 225, 233–234 (CA3 2007); *Solis* v. *Food Employers Labor Relations Assn.*, 2011 U. S. App. LEXIS 9110, *12 (CA4, May 4, 2011); *Wildbur* v. *Arco Chemical Co.*, 974 F. 2d 631, 645 (CA5 1992); *United States* v. *Evans*, 796 F. 2d 264, 265–266 (CA9 1986) *(per curiam)*. Not until the decision below had a federal appellate court held the exception to apply to the United States as trustee for the Indian tribes.

## B

In order to apply the fiduciary exception in this case, the Court of Appeals analogized the Government to a private trustee. 590 F. 3d, at 1313. We have applied that analogy in limited contexts, see, *e.g.*, *United States* v. *Mitchell*, 463 U. S. 206, 226 (1983) *(Mitchell II)*, but that does not mean the Government resembles a private trustee in every respect. On the contrary, this Court has previously noted that the relationship between the United States and the Indian tribes is distinctive, "different from that existing

between individuals whether dealing at arm's length, *as trustees and beneficiaries*, or otherwise." *Klamath and Moadoc Tribes* v. *United States*, 296 U. S. 244, 254 (1935) (emphasis added). "The *general* relationship between the United States and the Indian tribes is not comparable to a private trust relationship." *Cherokee Nation of Okla.* v. *United States*, 21 Cl. Ct. 565, 573 (1990) (emphasis added).

The Government, of course, is not a private trustee. Though the relevant statutes denominate the relationship between the Government and the Indians a "trust," see, *e.g.*, 25 U. S. C. §162a, that trust is defined and governed by statutes rather than the common law. See *United States* v. *Navajo Nation*, 537 U. S. 488, 506 (2003) *(Navajo I)* ("[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory pre-scriptions"). As we have recognized in prior cases, Con-gress may style its relations with the Indians a "trust" without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is "limited" or "bare" compared to a trust relationship between private parties at common law. *United States* v. *Mitchell*, 445 U. S. 535, 542 (1980) *(Mitchell I); Mitchell II, supra,* at 224.[4]

The difference between a private common-law trust and the statutory Indian trust follows from the unique position of the Government as sovereign. The distinction between "public rights" against the Government and "private

—————————

[4] "There are a number of widely varying relationships which more or less closely resemble trusts, but which are not trusts, although the term 'trust' is sometimes used loosely to cover such relationships. It is important to differentiate trusts from these other relationships, since many of the rules applicable to trusts are not applicable to them." Restatement (Second) of Trusts §4, Introductory Note, p. 15 (1957) (hereinafter Restatement 2d); see also *Begay* v. *United States*, 16 Cl. Ct. 107, 127, n. 17 (1987) ("[T]he provisions relating to private trustees and fiduciaries, while useful as analogies, cannot be regarded as finally dispositive in a government-Indian trustee-fiduciary relationship").

rights" between private parties is well established. The Government consents to be liable to private parties "and may yield this consent upon such terms and under such restrictions as it may think just." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 283 (1856). This creates an important distinction "between cases of private right and those which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell* v. *Benson*, 285 U. S. 22, 50 (1932).

Throughout the history of the Indian trust relationship, we have recognized that the organization and management of the trust is a sovereign function subject to the plenary authority of Congress. See *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 169, n. 18 (1982) ("The United States retains plenary authority to divest the tribes of any attributes of sovereignty"); *United States* v. *Wheeler*, 435 U. S. 313, 319 (1978) ("Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government"); *Winton* v. *Amos*, 255 U. S. 373, 391 (1921) ("Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property"); *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565 (1903) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government"); *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 308 (1902) ("The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts"); see also *United States* v. *Candelaria*, 271 U. S. 432, 439

(1926); *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 315 (1911).

Because the Indian trust relationship represents an exercise of that authority, we have explained that the Government "has a real and direct interest" in the guardianship it exercises over the Indian tribes; "the interest is one which is vested in it as a sovereign." *United States* v. *Minnesota*, 270 U. S. 181, 194 (1926). This is especially so because the Government has often structured the trust relationship to pursue its own policy goals. Thus, while trust administration "relat[es] to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States." *Heckman* v. *United States*, 224 U. S. 413, 437 (1912); see also *Candelaria*, *supra*, at 443–444.

In *Heckman*, the Government brought suit to cancel certain conveyances of allotted lands by members of an Indian tribe because the conveyances violated restrictions on alienation imposed by Congress. This Court explained that the Government brought suit as the representative of the very Indian grantors whose conveyances it sought to cancel, and those Indians were thereby bound by the judgment. 224 U. S., at 445–446. But while it was formally acting as a trustee, the Government was in fact asserting its own sovereign interest in the disposition of Indian lands, and the Indians were precluded from intervening in the litigation to advance a position contrary to that of the Government. *Id.*, at 445. Such a result was possible because the Government assumed a fiduciary role over the Indians not as a common-law trustee but as the governing authority enforcing statutory law.

We do not question "the undisputed existence of a general trust relationship between the United States and the Indian people." *Mitchell II*, 463 U. S., at 225. The Government, following "a humane and self imposed policy . . .

has charged itself with moral obligations of the highest responsibility and trust," *Seminole Nation* v. *United States*, 316 U. S. 286, 296–297 (1942), obligations "to the fulfillment of which the national honor has been committed," *Heckman*, *supra*, at 437.  Congress has expressed this policy in a series of statutes that have defined and redefined the trust relationship between the United States and the Indian tribes.  In some cases, Congress established only a limited trust relationship to serve a narrow purpose.  See *Mitchell I*, 445 U. S., at 544 (Congress intended the United States to hold land "'in trust'" under the General Allotment Act "simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation"); *Navajo I*, 537 U. S., at 507–508 (Indian Mineral Leasing Act imposes no "detailed fiduciary responsibilities" nor is the Government "expressly invested with responsibility to secure 'the needs and best interests of the Indian owner'").

In other cases, we have found that particular "statutes and regulations . . . clearly establish fiduciary obligations of the Government" in some areas.  *Mitchell II*, *supra*, at 226; see also *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465, 475 (2003).  Once federal law imposes such duties, the common law "could play a role." *United States* v. *Navajo Nation*, 556 U. S. \_\_\_, \_\_\_ (2009) *(Navajo II)* (slip op., at 14).  We have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed.  See *White Mountain Apache Tribe*, *supra*, at 475–476.  But the applicable statutes and regulations "establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Mitchell II*, *supra*, at 224.  When "the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter."

*Navajo II*, *supra*, at ___ (slip op., at 14).[5]  The Government
assumes Indian trust responsibilities only to the extent it
expressly accepts those responsibilities by statute.[6]

Over the years, we have described the federal relation-
ship with the Indian tribes using various formulations.
The Indian tribes have been called "domestic dependent
nations," *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831),
under the "tutelage" of the United States, *Heckman*, *su-
pra*, at 444, and subject to "the exercise of the Govern-
ment's guardianship over . . . their affairs," *United States*
v. *Sandoval*, 231 U. S. 28, 48 (1913).  These concepts do
not necessarily correspond to a common-law trust rela-
tionship.  See, *e.g.*, Restatement 2d, §7 ("A guardianship is
not a trust").  That is because Congress has chosen to
structure the Indian trust relationship in different ways.
We will apply common-law trust principles where Con-
gress has indicated it is appropriate to do so.  For that
reason, the Tribe must point to a right conferred by stat-
ute or regulation in order to obtain otherwise privileged
information from the Government against its wishes.

### III

In this case, the Tribe's claim arises from 25 U. S. C.
§§161–162a and the American Indian Trust Fund Man-
agement Reform Act of 1994, §4001 *et seq*.  These pro-
visions define "the trust responsibilities of the United
States" with respect to tribal funds.  §162a(d).  The Court
of Appeals concluded that the trust relationship between
the United States and the Indian tribes, outlined in these
and other statutes, is "sufficiently similar to a private
trust to justify applying the fiduciary exception."  590

───────────

[5]Thus, the dissent's reliance on the Government's "managerial con-
trol," *post*, at 8 (opinion of SOTOMAYOR, J.), is misplaced.

[6]Cf. Restatement 2d, §25, Comment *a* ("[A]lthough the settlor has
called the transaction a trust[,] no trust is created unless he manifests
an intention to impose duties which are enforceable in the courts").

F. 3d, at 1313. We disagree.

As we have discussed, the Government exercises its carefully delimited trust responsibilities in a sovereign capacity to implement national policy respecting the Indian tribes. The two features justifying the fiduciary exception—the beneficiary's status as the "real client" and the trustee's common-law duty to disclose information about the trust—are notably absent in the trust relationship Congress has established between the United States and the Tribe.

## A

The Court of Appeals applied the fiduciary exception based on its determination that the Tribe rather than the Government was the "real client" with respect to the Government attorneys' advice. *Ibid.* In cases applying the fiduciary exception, courts identify the "real client" based on whether the advice was bought by the trust corpus, whether the trustee had reason to seek advice in a personal rather than a fiduciary capacity, and whether the advice could have been intended for any purpose other than to benefit the trust. *Riggs*, 355 A. 2d, at 711–712. Applying these factors, we conclude that the United States does not obtain legal advice as a "mere representative" of the Tribe; nor is the Tribe the "real client" for whom that advice is intended. See *ibid.*

Here, the Government attorneys are paid out of congressional appropriations at no cost to the Tribe. Courts look to the source of funds as a "strong indicator of precisely who the real clients were" and a "significant factor" in determining who ought to have access to the legal advice. *Id.*, at 712. We similarly find it significant that the attorneys were paid by the Government for advice regarding the Government's statutory obligations.

The payment structure confirms our view that the Government seeks legal advice in its sovereign capacity rather

than as a conventional fiduciary of the Tribe. Undoubtedly, Congress intends the Indian tribes to benefit from the Government's management of tribal trusts. That intention represents "a humane and self imposed policy" based on felt "moral obligations." *Seminole Nation*, 316 U. S., at 296–297. This statutory purpose does not imply a full common-law trust, however. Cf. Restatement 2d, §25, Comment *b* ("No trust is created if the settlor manifests an intention to impose merely a moral obligation"). Congress makes such policy judgments pursuant to its sovereign governing authority, and the implementation of federal policy remains "distinctly an interest of the United States." *Heckman*, 224 U. S., at 437.[7] We have said that "the United States continue[s] as trustee to have an active interest" in the disposition of Indian assets because the terms of the trust relationship embody policy goals of the United States. *McKay* v. *Kalyton*, 204 U. S. 458, 469 (1907).

In some prior cases, we have found that the Government had established the trust relationship in order to impose its own policy on Indian lands. See *Mitchell I*, 445 U. S., at 544 (Congress "intended that the United States 'hold the land . . . in trust' . . . because it wished to prevent alienation of the land"). In other cases, the Government has invoked its trust relationship to prevent state interference with its policy toward the Indian tribes. See *Minnesota* v. *United States*, 305 U. S. 382, 386 (1939); *Candelaria*, 271 U. S., at 442–444; *United States* v. *Kagama*, 118 U. S. 375, 382–384 (1886). And the exercise of federal authority thereby established has often been "left under the acts of Congress to the discretion of the Executive

―――――――――

[7] Chief Justice Hughes, writing for a unanimous Court, insisted that the "national interest" in the management of Indian affairs "is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust." *Heckman*, 224 U. S., at 437.

Department." *Heckman*, *supra*, at 446. In this way, Congress has designed the trust relationship to serve the interests of the United States as well as to benefit the Indian tribes. See *United States* v. *Rickert*, 188 U. S. 432, 443 (1903) (trust relationship "'authorizes the adoption on the part of the United States of such policy as their own public interests may dictate'" (quoting *Choctaw Nation* v. *United States*, 119 U. S. 1, 28 (1886))).[8]

We cannot agree with the Tribe and its *amici* that "[t]he government and its officials who obtained the advice have no stake in [the] substance of the advice, beyond their trustee role," Brief for Respondent 9, or that "the United States' interests in trust administration were identical to

_____

[8] Congress has structured the trust relationship to reflect its considered judgment about how the Indians ought to be governed. For example, the Indian General Allotment Act of 1887, 24 Stat. 388, was "a comprehensive congressional attempt to change the role of Indians in American society." F. Cohen, Handbook of Federal Indian Law §1.04, p. 77 (2005) (hereinafter Cohen). Congress aimed to promote the assimilation of Indians by dividing Indian lands into individually owned allotments. The federal policy aimed "to substitute a new individual way of life for the older Indian communal way." *Id.*, at 79. The Indian Reorganization Act of 1934, 48 Stat. 984, marked a shift away "from assimilation policies and toward more tolerance and respect for traditional aspects of Indian culture." Cohen §1.05, at 84. The Act prohibited further allotment and restored tribal ownership. *Id.*, at 86. The Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203, and the Tribal Self-Governance Act of 1994, 108 Stat. 4270, enabled tribes to run health, education, economic development, and social programs for themselves. Cohen §1.07, at 103. This strengthened self-government supported Congress' decision to authorize tribes to withdraw trust funds from Federal Government control and place the funds under tribal control. American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, 4242–4244; see 25 U. S. C. §§4021–4029 (2006 ed. and Supp. III). The control over the Indian tribes that has been exercised by the United States pursuant to the trust relationship—forcing the division of tribal lands, restraining alienation—does not correspond to the fiduciary duties of a common-law trustee. Rather, the trust relationship has been altered and administered as an instrument of federal policy.

the interests of the tribal trust fund beneficiaries," Brief for National Congress of American Indians et al. as *Amici Curiae* 5. The United States has a sovereign interest in the administration of Indian trusts distinct from the private interests of those who may benefit from its administration. Courts apply the fiduciary exception on the ground that "management does not manage for itself." *Garner*, 430 F. 2d, at 1101; *Wachtel*, 482 F. 3d, at 232 ("[O]f central importance in both *Garner* and *Riggs* was the fiduciary's lack of a legitimate personal interest in the legal advice obtained"). But the Government is never in that position. While one purpose of the Indian trust relationship is to benefit the tribes, the Government has its own independent interest in the implementation of federal Indian policy. For that reason, when the Government seeks legal advice related to the administration of tribal trusts, it establishes an attorney-client relationship related to its sovereign interest in the execution of federal law. In other words, the Government seeks legal advice in a "personal" rather than a fiduciary capacity. See *Riggs*, 355 A. 2d, at 711.

Moreover, the Government has too many competing legal concerns to allow a case-by-case inquiry into the purpose of each communication. When "multiple interests" are involved in a trust relationship, the equivalence between the interests of the beneficiary and the trustee breaks down. *Id.*, at 714. That principle applies with particular force to the Government. Because of the multiple interests it must represent, "the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent." *Nevada* v. *United States*, 463 U. S. 110, 128 (1983).

As the Court of Appeals acknowledged, the Government may be obliged "to balance competing interests" when it

administers a tribal trust. 590 F. 3d, at 1315. The Government may need to comply with other statutory duties, such as the environmental and conservation obligations that the Court of Appeals discussed. See *id.*, at 1314–1315. The Government may also face conflicting obligations to different tribes or individual Indians. See, *e.g.*, *Nance* v. *EPA*, 645 F. 2d 701, 711 (CA9 1981) (Federal Government has "conflicting fiduciary responsibilities" to the Northern Cheyenne and Crow Tribes); *Hoopa Valley Tribe* v. *Christie*, 812 F. 2d 1097, 1102 (CA9 1986) ("No trust relation exists which can be discharged to the plaintiff here at the expense of other Indians"). Within the bounds of its "general trust relationship" with the Indian people, we have recognized that the Government has "discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide." *Lincoln* v. *Vigil*, 508 U. S. 182, 195 (1993); see also *ibid.* ("Federal Government 'does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to *all* Indian tribes'" (quoting *Hoopa Valley Tribe*, *supra*, at 1102)). And sometimes, we have seen, the Government has enforced the trust statutes to dispose of Indian property contrary to the wishes of those for whom it was nominally kept in trust. The Government may seek the advice of counsel for guidance in balancing these competing interests. Indeed, the point of consulting counsel may be to determine whether conflicting interests are at stake.

The Court of Appeals sought to accommodate the Government's multiple obligations by suggesting that the Government may invoke the attorney-client privilege if it identifies "a specific competing interest" that was considered in the particular communications it seeks to withhold. 590 F. 3d, at 1313. But the conflicting interests the Government must consider are too pervasive for such a case-by-case approach to be workable.

We have said that for the attorney-client privilege to be effective, it must be predictable.  See *Jaffee* v. *Redmond*, 518 U. S. 1, 18 (1996); *Upjohn*, 449 U. S., at 393.  If the Government were required to identify the specific interests it considered in each communication, its ability to receive confidential legal advice would be substantially compromised.  The Government will not always be able to predict what considerations qualify as a "specific competing interest," especially in advance of receiving counsel's advice.  Forcing the Government to monitor all the considerations contained in each communication with counsel would render its attorney-client privilege "little better than no privilege at all."  *Ibid*.

B

The Court of Appeals also decided the fiduciary exception properly applied to the Government because "the fiduciary has a duty to disclose all information related to trust management to the beneficiary."  590 F. 3d, at 1312.  In general, the common-law trustee of an irrevocable trust must produce trust-related information to the beneficiary on a reasonable basis, though this duty is sometimes limited and may be modified by the settlor.  Restatement (Third) of Trusts §82 (2005) (hereinafter Restatement 3d); Bogert §§962, 965.[9]  The fiduciary exception applies where

_____

[9] We assume for the sake of argument that an Indian trust is properly analogized to an irrevocable trust rather than to a revocable trust.  A revocable trust imposes no duty of the trustee to disclose information to the beneficiary.  "[W]hile a trust is revocable, only the person who may revoke it is entitled to receive information about it from the trustee."  Bogert §962, at 25, §964; Restatement 3d, §74, Comment *e*, at 31 ("[T]he trustee of a revocable trust is not to provide reports or accountings or other information concerning the terms or administration of the trust to other beneficiaries without authorization either by the settlor or in the terms of the trust or a statute").  In many respects, Indian trusts resemble revocable trusts at common law because Congress has acted as the settlor in establishing the trust and retains the right to

this duty of disclosure overrides the attorney-client privilege. *United States* v. *Mett*, 178 F. 3d 1058, 1063 (CA9 1999) ("[T]he fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle").

The United States, however, does not have the same common-law disclosure obligations as a private trustee. As we have previously said, common-law principles are relevant only when applied to a "specific, applicable, trust-creating statute or regulation." *Navajo II*, 556 U. S., at ___ (slip op., at 14). The relevant statute in this case is 25 U. S. C. §162a(d), which delineates "trust responsibilities of the United States" that the Secretary of the Interior must discharge. The enumerated responsibilities include a provision identifying the Secretary's obligation to provide specific information to tribal account holders: The Secretary must "suppl[y] account holders with periodic statements of their account performance" and must make "available on a daily basis" the "balances of their account." §162a(d)(5). The Secretary has complied with these requirements by adopting regulations that instruct the Office of Trust Fund Management to provide each tribe with a quarterly statement of performance, 25 CFR §115.801 (2010), that identifies "the source, type, and status of the trust funds deposited and held in a trust account; the beginning balance; the gains and losses; receipts and disbursements; and the ending account balance of the quarterly statement period," §115.803. Tribes may request more frequent statements or further "infor-

_____

alter the terms of the trust by statute, even in derogation of tribal property interests. See *Winton* v. *Amos*, 255 U. S. 373, 391 (1921) ("It is thoroughly established that Congress has plenary authority over the Indians . . . and full power to legislate concerning their tribal property"); Cohen §5.02[4], at 401–403. The Government has not advanced the argument that the relationship here is similar to a revocable trust, and the point need not be addressed to resolve this case.

mation about account transactions and balances." §115.802.

The common law of trusts does not override the specific trust-creating statute and regulations that apply here. Those provisions define the Government's disclosure obligation to the Tribe. The Tribe emphasizes, Brief for Respondent 34, that the statute identifies the list of trust responsibilities as nonexhaustive. See §162a(d) (trust responsibilities "are not limited to" those enumerated). The Government replies that this clause "is best read to refer to other statutory and regulatory requirements" rather than to common-law duties. Brief for United States 38. Whatever Congress intended, we cannot read the clause to include a general common-law duty to disclose all information related to the administration of Indian trusts. When Congress provides specific statutory obligations, we will not read a "catchall" provision to impose general obligations that would include those specifically enumerated. *Massachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134, 141–142 (1985). "As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988). Reading the statute to incorporate the full duties of a private, common-law fiduciary would vitiate Congress' specification of narrowly defined disclosure obligations.[10]

───────────

[10] Our reading of 25 U. S. C. §162a(d) receives additional support from another statute in which Congress expressed its understanding that the Government retains evidentiary privileges allowing it to withhold information related to trust property from Indian tribes. The Indian Claims Limitation Act of 1982, 96 Stat. 1976, addressed Indian claims that the claimants desired to have litigated by the United States. If the Secretary of the Interior decided to reject a claim for litigation, he was required to furnish a report to the affected Indian claimants and, upon their request, to provide "any nonprivileged research materials or evidence gathered by the United States in the documentation of such

By law and regulation, moreover, the documents at issue in this case are classed "the property of the United States" while other records are "the property of the tribe." 25 CFR §115.1000 (2010); see also §§15.502, 162.111, 166.1000. Just as the source of the funds used to pay for legal advice is highly relevant in identifying the "real client" for purposes of the fiduciary exception, we consider ownership of the resulting records to be a significant factor in deciding who "ought to have access to the document." See *Riggs*, 355 A. 2d, at 712. In this case, that privilege belongs to the United States.[11]

\*   \*   \*

Courts and commentators have long recognized that "[n]ot every aspect of private trust law can properly govern the unique relationship of tribes and the federal government." Cohen §5.02[2], at 434–435. The fiduciary exception to the attorney-client privilege ranks among those aspects inapplicable to the Government's administration of Indian trusts. The Court of Appeals denied the Government's petition for a writ of mandamus based on its erroneous view to the contrary. We leave it for that court to determine whether the standards for granting the writ

——————

claim." Id., at 1978. That Congress authorized the withholding of information on grounds of privilege makes us doubt that Congress understood the Government's trust obligations to override so basic a privilege as that between attorney and client.

[11] The dissent tells us that applying the fiduciary exception is even more important against the Government than against a private trustee because of a "history of governmental mismanagement." *Post*, at 21. While it is not necessary to our decision, we note that the Indian tribes are not required to keep their funds in federal trust. See 25 U. S. C. §4022 (authorizing tribes to withdraw funds held in trust by the United States); 25 CFR pt. 1200(B). If the Tribe wishes to have its funds managed by a "conventional fiduciary," *post*, at 10, it may seek to do so.

Opinion of the Court

are met in light of our opinion.[12]  We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

---

[12] If the Court of Appeals declines to issue the writ, we assume that the CFC on remand will follow our holding here regarding the applicability of the fiduciary exception in the present context.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–382

UNITED STATES, PETITIONER *v.* JICARILLA APACHE NATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[June 13, 2011]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring in the judgment.

I agree with the Court that the Government is not an ordinary trustee. See *ante*, at 17–19. Unlike a private trustee, the Government has its own "distinc[t] interest" in the faithful carrying out of the laws governing the conduct of tribal affairs. *Heckman* v. *United States*, 224 U. S. 413, 437 (1912). This unique "national interest," *ibid.*, obligates Government attorneys, in rendering advice, to make their own "independent evaluation of the law and facts" in an effort "to arrive at a single position of the United States," App. to Pet. for Cert. 124a (Letter from Attorney General Griffin B. Bell to Secretary of the Interior Cecil D. Andrus (May 31, 1979)). "For that reason," as the Court explains, "the Government seeks legal advice in a 'personal' rather than a fiduciary capacity." *Ante*, at 18. The attorney-client privilege thus protects the Government's communications with its attorneys from disclosure.

Going beyond attorney-client communications, the Court holds that the Government "assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *Ante*, at 14. The Court there-

fore concludes that the trust relationship described by 25
U. S. C. §162a does not include the usual "common-law
disclosure obligations." *Ante*, at 21.  Because it is unnec-
essary to decide what information *other than* attorney-
client communications the Government may withhold
from the beneficiaries of tribal trusts, I concur only in the
Court's judgment.

# SUPREME COURT OF THE UNITED STATES

No. 10–382

UNITED STATES, PETITIONER *v.* JICARILLA
APACHE NATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[June 13, 2011]

JUSTICE SOTOMAYOR, dissenting.

Federal Indian policy, as established by a network of federal statutes, requires the United States to act strictly in a fiduciary capacity when managing Indian trust fund accounts. The interests of the Federal Government as trustee and the Jicarilla Apache Nation (Nation) as beneficiary are thus entirely aligned in the context of Indian trust fund management. Where, as here, the governing statutory scheme establishes a conventional fiduciary relationship, the Government's duties include fiduciary obligations derived from common-law trust principles. Because the common-law rationales for the fiduciary exception fully support its application in this context, I would hold that the Government may not rely on the attorney-client privilege to withhold from the Nation communications between the Government and its attorneys relating to trust fund management.

The Court's decision to the contrary rests on false factual and legal premises and deprives the Nation and other Indian tribes of highly relevant evidence in scores of pending cases seeking relief for the Government's alleged mismanagement of their trust funds. But perhaps more troubling is the majority's disregard of our settled precedent that looks to common-law trust principles to define the scope of the Government's fiduciary obligations to

Indian tribes. Indeed, aspects of the majority's opinion suggest that common-law principles have little or no relevance in the Indian trust context, a position this Court rejected long ago. Although today's holding pertains only to a narrow evidentiary issue, I fear the upshot of the majority's opinion may well be a further dilution of the Government's fiduciary obligations that will have broader negative repercussions for the relationship between the United States and Indian tribes.

## I

## A

Federal Rule of Evidence 501 provides in relevant part that "the privilege of a . . . government . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Rule 501 "was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them." *United States* v. *Weber Aircraft Corp.*, 465 U. S. 792, 804, n. 25 (1984).

As the majority notes, the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981). But the majority neglects to explain that the privilege is a limited exception to the usual rules of evidence requiring full disclosure of relevant information. See 8 J. Wigmore, Evidence §2192, p. 64 (3d ed. 1940) (common law recognizes "fundamental maxim that the public . . . has a right to every man's evidence" and that "any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule"). Because it "has the effect of withholding relevant information from the factfinder," courts construe

the privilege narrowly. *Fisher* v. *United States*, 425 U. S. 391, 403 (1976). It applies "only where necessary to achieve its purpose," *ibid.*; "[w]here this purpose ends, so too does the protection of the privilege," *Wachtel* v. *Health Net, Inc.*, 482 F. 3d 225, 231 (CA3 2007).

The fiduciary exception to the attorney-client privilege has its roots in 19th-century English common-law cases holding that, "when a trustee obtained legal advice relating to his administration of the trust, and not in anticipation of adversarial legal proceedings against him, the beneficiaries of the trust had the right to the production of that advice." *Ibid.* (collecting cases). The fiduciary exception is now well recognized in the jurisprudence of both federal and state courts,[1] and has been applied in a wide variety of contexts, including in litigation involving common-law trusts, see, *e.g.*, *Riggs Nat. Bank of Washington, D. C.* v. *Zimmer*, 355 A. 2d 709 (Del. Ch. 1976), disputes between corporations and shareholders, see, *e.g.*, *Garner* v. *Wolfinbarger*, 430 F. 2d 1093 (CA5 1970), and ERISA enforcement actions, see, *e.g.*, *United States* v. *Doe*, 162 F. 3d 554 (CA9 1999).

The majority correctly identifies the two rationales courts have articulated for applying the fiduciary exception, *ante*, at 8–9, but its description of those rationales omits a number of important points. With regard to the first rationale, courts have characterized the trust beneficiary as the "real client" of legal advice relating to trust

─────────

[1] See, *e.g.*, *Solis* v. *Food Employers Labor Relations Assn.*, \_\_ F. 3d \_\_, 2011 WL 1663597, \*4–5 (CA4 2011); *Wachtel* v. *Health Net, Inc.*, 482 F. 3d 225, 232–234 (CA3 2007); *Bland* v. *Fiatallis North America, Inc.*, 401 F. 3d 779, 787–788 (CA7 2005); *United States* v. *Mett*, 178 F. 3d 1058, 1062–1064 (CA9 1999); *In re Long Island Lighting Co.*, 129 F. 3d 268, 271–272 (CA2 1997); *Wildbur* v. *ARCO Chemical Co.*, 974 F. 2d 631, 645 (CA5 1992); *Fausek* v. *White*, 965 F. 2d 126, 132–133 (CA6 1992); see also Restatement (Third) of Trusts §82, Comment *f* and Reporter's Notes on §82, pp. 187–188, 198–204 (2005); Restatement of Law (Third) Governing Lawyers §84 (1998).

administration because such advice, provided to a trustee to assist in his management of the trust, is ultimately for the benefit of the trust beneficiary, rather than for the trustee in his personal capacity. See, *e.g.*, *United States* v. *Mett*, 178 F. 3d 1058, 1063 (CA9 1999) (" '[A]s a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served'" (quoting *United States* v. *Evans*, 796 F. 2d 264, 266 (CA9 1986) *(per curiam)*)); *Riggs*, 355 A. 2d, at 713 (same). The majority places heavy emphasis on the source of payment for the legal advice, see *ante*, at 8, 15, but it is well settled that who pays for the legal advice, although "potentially relevant," "is not determinative in resolving issues of privilege." Restatement (Third) of Trusts §82, Comment *f*, p. 188 (2005) (hereinafter Third Restatement). Instead, the lynchpin of the "real client" inquiry is the identity of the ultimate beneficiary of the legal advice. See *Wachtel*, 482 F. 3d, at 232 ("[O]f central importance . . . [i]s the fiduciary's lack of a legitimate personal interest in the legal advice obtained"). If the advice was rendered for the benefit of the beneficiary and not for the trustee in any personal capacity, the "real client" of the advice is the beneficiary.

As to the second rationale for the fiduciary exception— rooted in the trustee's fiduciary duty to disclose all information related to trust management—the majority glosses over the fact that this duty of disclosure is designed "to enable the beneficiary to prevent or redress a breach of trust and otherwise to enforce his or her rights under the trust." Third Restatement §82, Comment *a(2)*, at 184. As the leading American case on the fiduciary exception explains, "[i]n order for the beneficiaries to hold the trustee to the proper standards of care and honesty and procure for themselves the benefits to which they are entitled, their knowledge of the affairs and mechanics of the trust

management is crucial." *Riggs*, 355 A. 2d, at 712. Courts justifying the fiduciary exception under this rationale have thus concluded that "[t]he policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is . . . ultimately more important than the protection of the trustees' confidence in the attorney for the trust." *Id.*, at 714; see *Mett*, 178 F. 3d, at 1063 (under this rationale, "the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle"). The majority fails to appreciate the important oversight and accountability interests that underlie this rationale for the fiduciary exception, or explain why they operate with any less force in the Indian trust context.

B

The question in this case is whether the fiduciary exception applies in the Indian trust context such that the Government may not rely on the attorney-client privilege to withhold from the Nation communications between the Government and its attorneys relating to the administration of the Nation's trust fund accounts. Answering that question requires a proper understanding of the nature of the Government's trust relationship with Indian tribes, particularly with regard to its management of Indian trust funds.

Since 1831, this Court has recognized the existence of a general trust relationship between the United States and Indian tribes. See *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831) (Marshall, C. J.). Our decisions over the past century have repeatedly reaffirmed this "distinctive obligation of trust incumbent upon the Government" in its dealings with Indians. *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942); see *United States* v. *Mitchell*, 463 U. S. 206, 225–226 (1983) *(Mitchell II)* (collecting cases and noting "the undisputed existence of a general trust

relationship between the United States and the Indian people"). Congress, too, has recognized the general trust relationship between the United States and Indian tribes. Indeed, "[n]early every piece of modern legislation dealing with Indian tribes contains a statement reaffirming the trust relationship between tribes and the federal government." F. Cohen, Handbook of Federal Indian Law §5.04[4][a], pp. 420–421 (2005 ed.) (hereinafter Cohen).[2]

Against this backdrop, Congress has enacted federal statutes that "define the contours of the United States' fiduciary responsibilities" with regard to its management of Indian tribal property and other trust assets. *Mitchell II*, 463 U. S., at 224. The Nation's claims as relevant in this case concern the Government's alleged mismanagement of its tribal trust fund accounts. See *ante*, at 3.

The system of trusteeship and federal management of Indian funds originated with congressional enactments in the 19th century directing the Government to hold and manage Indian tribal funds in trust. See, *e.g.*, Act of June 9, 1837, 5 Stat. 135; see also Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H. R. Rep. No. 102–449, p. 6 (1992) (hereinafter Misplaced Trust). Through these and later congressional enactments, the United States has come to manage almost $3 billion in tribal funds and collects close to $380 million per year on behalf of tribes. Cohen §5.03[3][b], at 407.[3]

—————

[2] See, *e.g.*, 25 U. S. C. §458cc(a) (directing Secretary of the Interior to enter into funding agreements with Indian tribes "in a manner consistent with the Federal Government's laws and trust relationship to and responsibility for the Indian people"); §3701 (finding that the Government "has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes"); 20 U. S. C. §7401 ("It is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children").

[3] Trust fund accounts are "comprised mainly of money received

Today, numerous statutes outline the Federal Government's obligations as trustee in managing Indian trust funds. In particular, the Secretary of the Treasury, at the request of the Secretary of the Interior, must invest "[a]ll funds held in trust by the United States . . . to the credit of Indian tribes" in certain securities "suitable to the needs of the fund involved." 25 U. S. C. §161a(a). The Secretary of the Interior may deposit in the Treasury and pay mandatory interest on Indian trust funds when "the best interests of the Indians will be promoted by such deposits, in lieu of investments." §161. Similarly, the Secretary of the Interior may invest tribal trust funds in certain public debt instruments "if he deems it advisable and for the best interest of the Indians." §162a(a). And Congress has set forth a nonexhaustive list of the Secretary of the Interior's "trust responsibilities" with respect to Indian trust funds, which include a series of accounting, auditing, management, and disclosure obligations. §162a(d). These and other statutory provisions[4] give the United States "full responsibility to manage Indian [trust fund accounts] for the benefit of the Indians." *Mitchell II*, 463 U. S., at 224.

"[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over [trust assets] belonging to Indians." *Id.*, at 225. Under the

_____

through the sale or lease of trust lands and include timber stumpage, oil and gas royalties, and agriculture fees," as well as "judgment funds awarded to tribes." H. R. Rep. No. 103–778, p. 9 (1994). The Nation's claims involve proceeds derived from the Government's management of the Nation's timber, gravel, and other resources and leases of reservation lands. The Government has held these funds in trust for the Nation since the late 1880's. See App. to Pet. for Cert. 98a–100a, 105a.

[4] See, *e.g.*, 25 U. S. C. §4011(a) (requiring Secretary of the Interior to account "for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe"); §4041(1) (creating the Office of Special Trustee for American Indians "to provide for more effective management of, and accountability for the proper discharge of, the Secretary's trust responsibilities to Indian tribes").

statutory regime described above, the Government has extensive managerial control over Indian trust funds, exercises considerable discretion with respect to their investment, and has assumed significant responsibilities to account to the tribal beneficiaries. As a result, "[a]ll of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian [Tribe]), and a trust corpus (Indian . . . funds)." *Ibid.* Unlike in other contexts where the statutory scheme creates only a "bare trust" entailing only limited responsibilities, *United States* v. *Navajo Nation*, 537 U. S. 488, 505 (2003) *(Navajo I)* (internal quotation marks omitted),[5] the statutory regime governing the United States' obligations with regard to Indian trust funds "bears the hallmarks of a conventional fiduciary relationship," *United States* v. *Navajo Nation*, 556 U. S. ___, ___ (2009) *(Navajo II)* (slip op., at 14) (internal quotation marks omitted); see *Lincoln* v. *Vigil*, 508 U. S. 182, 194 (1993) ("[T]he law is 'well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity'" (quot-

—————

[5] For example, in *United States* v. *Mitchell*, 445 U. S. 535 (1980) *(Mitchell I),* this Court held that a federal statute which authorized the President to allot a specified number of acres to individual Indians residing on reservation lands did not "provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Id.*, at 542. Under the statute, "the Indian allottee, and not a representative of the United States, is responsible for using the land for agricultural or grazing purposes." *Id.*, at 542–543. Accordingly, we concluded that Congress did not intend to "impose upon the Government all fiduciary duties ordinarily placed by equity upon a trustee" because the statute "created only a limited trust relationship between the United States and the allottee." *Id.*, at 542; see also *Navajo I*, 537 U. S., at 507–508 (concluding that Secretary of the Interior did not assume "fiduciary duties" under the relevant statutory scheme because "[t]he Secretary is neither assigned a comprehensive managerial role nor, . . . expressly invested with responsibility to secure the needs and best interests of the Indian owner and his heirs" (internal quotation marks omitted)).

ing *United States* v. *Cherokee Nation of Okla.*, 480 U. S. 700, 707 (1987)).

## II

In light of Federal Rule of Evidence 501 and the Government's role as a conventional fiduciary in managing Indian trust fund accounts, I would hold as a matter of federal common law that the fiduciary exception is applicable in the Indian trust context, and thus the Government may not rely on the attorney-client privilege to withhold communications related to trust management. As explained below, the twin rationales for the fiduciary exception fully support its application in this context. The majority's conclusion to the contrary rests on flawed factual and legal premises.

## A

When the Government seeks legal advice from a government attorney on matters relating to the management of the Nation's trust funds, the "real client" of that advice for purposes of the fiduciary exception is the Nation, not the Government. The majority's rejection of that conclusion is premised on its erroneous view that the Government, in managing the Nation's trust funds, "has its own independent interest in the implementation of federal Indian policy" that diverges from the interest of the Nation as beneficiary. *Ante*, at 18; see also *ante*, at 1 (GINSBURG, J., concurring in judgment).

The majority correctly notes that, as a general matter, the Government has sovereign interests in managing Indian trusts that distinguish it from a private trustee. See, *e.g.*, *United States* v. *Minnesota*, 270 U. S. 181, 194 (1926). Throughout the history of the Federal Government's dealings with Indian tribes, Congress has altered and administered the trust relationship "as an instrument of federal policy." *Ante*, at 17, n. 8 (detailing shifts in

policy); see generally *Cobell* v. *Norton*, 240 F. 3d 1081, 1086–1088 (CADC 2001) (same, and describing that history as "contentious and tragic").

In the specific context of Indian trust fund management, however, federal Indian policy entirely aligns the interests of the Government as trustee and the Indian tribe as beneficiary. As explained above, Congress has enacted an extensive network of statutes regulating the Government's management of Indian trust fund accounts. That statutory framework establishes a "conventional fiduciary relationship" in the context of Indian trust fund administration. *Navajo Nation II*, 556 U. S., at ___ (slip op., at 14) (internal quotation marks omitted); see *supra*, at 7–9.

As a conventional fiduciary, the Government's management of Indian trust funds must "be judged by the most exacting fiduciary standards." *Seminole Nation*, 316 U. S., at 296–297. Among the most fundamental fiduciary obligations of a trustee is "to administer the trust solely in the interest of the beneficiaries." 2A A. Scott & W. Fratcher, Law of Trusts §170, p. 311 (4th ed. 1987); see *Meinhard* v. *Salmon*, 249 N. Y. 458, 464, 164 N. E. 545, 546 (1928) (Cardozo, C. J.) ("Not honesty alone, but the punctilio of an honor the most sensitive," is "the standard of behavior" for trustees "bound by fiduciary ties"). Although Indian trust funds are deposited in the United States Treasury, "they are not part of the federal government's general funds and can be used only for the benefit of the tribe." Cohen §5.03[3][b], at 408, and n. 140 (citing *Quick Bear* v. *Leupp*, 210 U. S. 50, 80–81 (1908)).

Because federal Indian policy requires the Government to act strictly as a conventional fiduciary in managing the Nation's trust funds, the Government acts in a "representative" rather than "persona[l]" capacity when managing the Nation's trust funds. *Riggs*, 355 A. 2d, at 713. By law, the Government cannot pursue any "independent" interest, *ante*, at 18, distinct from its responsibilities as a fidu-

ciary. See Cohen §5.03[3][b], at 408, and n. 141 ("Federal statutes forbid use of Indian tribal funds in any manner not authorized by treaty or express provisions of law" (citing 25 U. S. C. §§122, 123)). In other words, any uniquely sovereign interest the Government may have in other contexts of its trust relationship with Indian tribes does not exist in the specific context of Indian trust fund administration. It naturally follows, then, that when the Government seeks legal advice from government attorneys relating to the management of the Nation's trust funds, the "real client" of the advice for purposes of the fiduciary exception is the Nation, not the Government.

This conclusion holds true even though government attorneys are "paid out of congressional appropriations at no cost to the [Nation]." *Ante*, at 15. As noted above, although the source of funding for legal advice may be relevant, the ultimate inquiry is for whose benefit the legal advice was rendered. See *supra*, at 4. And, for all the emphasis the majority places on the funding source here, see *ante*, at 8, 15, the majority never suggests that the fiduciary exception would apply if Congress amended federal law to permit Indian tribes to pay government attorneys out of their own trust funds.[6]

The majority also suggests that, even if the interests of the United States and Indian tribes may be equivalent in some contexts, that "equivalence" "breaks down" when there are "multiple interests" involved in a trust relationship. *Ante*, at 18. According to the majority, "the Government has too many competing legal concerns to allow a case-by-case inquiry into the purpose of each communica-

---

[6] The majority also states that ownership of the requested documents is "a significant factor" in deciding whether the fiduciary exception applies, *ante*, at 23, but the only case it cites as support deals with the source of payment for the legal advice, not the ownership of the documents. See *ibid.* (citing *Riggs Nat. Bank of Washington, D. C.* v. *Zimmer*, 355 A. 2d 709, 712 (Del. Ch. 1976)).

tion." *Ibid.* As a result, the majority concludes that the fiduciary exception should not be applied at all in the Indian trust context. *Ibid.*

Preliminarily, while the Government in certain circumstances may have sovereign obligations that conflict with its duties as a fiduciary for Indian tribes, see, *e.g.*, *Nevada* v. *United States*, 463 U. S. 110 (1983),[7] the existence of competing interests is not unique to the Government as trustee. Indeed, the issue of competing interests arises frequently in the private trust context. See, *e.g.*, Third Restatement §78, Comment *c*, at 97–103 (describing duties of trustee with respect to "transactions that involve conflicting fiduciary and personal interests"); *id.*, §79, Comment *b*, at 128–129 (describing trustee's duty of impartiality in "balancing . . . competing interests" of multiple beneficiaries). In such circumstances, "a trustee—and ultimately a court—may need to provide some response that offers a compromise between the confidentiality or privacy concerns of some and the interest-protection needs

_____

[7] In *Nevada*, the Government represented certain tribes in litigation involving water rights even though it was also required by statute to represent the water rights of a reclamation project. See 463 U. S., at 128 (noting that Congress delegated to the Secretary of the Interior "both the responsibility for the supervision of the Indian tribes and the commencement of reclamation projects in areas adjacent to reservation lands"). Because of this dual litigating responsibility, we noted that "it is simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obliged it to represent other interests as well." *Ibid.* We thus observed in the context of that case that "the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent." *Ibid.* We expressly distinguished the context "where only a relationship between the Government and the tribe is involved." *Id.*, at 142. In that context, we acknowledged that "the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States." *Ibid.*

of others." *Id.*, §82, Comment *f*, at 188. The majority provides no reason why federal courts applying the fiduciary exception in the Indian trust context could not similarly adopt a workable framework that adequately takes into account any unique governmental interests that bear on the application of the fiduciary exception in any given circumstance. See Fed. Rule Civ. Proc. 26(b)(2)(C) (authorizing courts to set limits on discovery based on equitable concerns).

The majority's categorical rejection of the fiduciary exception in the Indian trust context sweeps far broader than necessary. This case involves only the Government's alleged mismanagement of the Nation's trust fund accounts, and the Government did not claim below that the attorney-client communications at issue relate to any competing governmental obligations. See App. to Pet. for Cert. 18a–19a. To the extent the United States in other contexts has competing interests, the Government and its attorneys already have to identify those interests in determining how to balance them against their obligations to Indian tribes, and attorney-client communications relating to those interests may properly be withheld or redacted consistent with application of the fiduciary exception. See 88 Fed. Cl. 1, 13 (2009) (observing that redactions "allo[w] the privilege and exception to reign supreme within their respective spheres").

The majority's categorical approach fails to appreciate that privilege determinations are by their very nature made on a case-by-case—indeed, document-by-document—basis. Government attorneys, like private counsel, must review each requested document and make an individualized assessment of privilege, and courts reviewing privilege logs and challenges must do the same. "While such a 'case-by-case' basis may to some slight extent undermine desirable certainty in the boundaries of the attorney-client privilege, it obeys the spirit of" of Rule 501, *Upjohn*, 449

U. S., at 396–397, which " 'provide[s] the courts with the flexibility to develop rules of privilege on a case-by-case basis,' " *Trammel* v. *United States*, 445 U. S. 40, 47 (1980) (quoting 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate)); see S. Rep. No. 93–1277, p. 13 (1974) ("[T]he recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis").

Rather than fashioning a blanket rule against application of the fiduciary exception in the Indian trust context, I would, consistent with Rule 501 and principles of judicial restraint, decide the question solely on the facts before us. See *Upjohn*, 449 U. S., at 386 (noting that "we sit to decide concrete cases and not abstract propositions of law" and "declin[ing] to lay down a broad rule or series of rules to govern all conceivable future questions in this area"). On those facts, the fiduciary exception applies to the communications in this case.

B

Like the "real client" rationale, the second rationale for the fiduciary exception, rooted in a trustee's fiduciary duty to disclose all matters relevant to trust administration to the beneficiary, fully supports disclosure of the communications in this case. As explained above, courts relying on this second rationale have recognized that "[t]he policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is . . . ultimately more important than the protection of the trustees' confidence in the attorney for the trust." *Riggs*, 355 A. 2d, at 714. Because the statutory scheme requires the Government to act as a conventional fiduciary in managing the Nation's trust funds, the Government's fiduciary duty to keep the Nation informed of matters relating to trust administration includes the concomitant duty to disclose attorney-client communications relating to trust fund management. See Third Restatement §82, Comment *f*, at 187–188; Restate-

ment of the Law (Third) Governing Lawyers §84, pp. 627–628 (1998).

Notably, the majority does not suggest that the Nation needs less information than a private beneficiary to exercise effective oversight over the Government as trustee. Instead, the majority contends that the Nation is entitled to less disclosure because the Government's disclosure obligations are more limited than a private trustee. In particular, the majority states that the Government "assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute," and thus the Nation "must point to a right conferred by statute or regulation in order to obtain otherwise privileged information from the Government against its wishes." *Ante*, at 14. The majority cites a single statutory provision and its implementing regulations as "defin[ing] the Government's disclosure obligation to the [Nation]." *Ante*, at 22; see *ante*, at 21–22 (citing 25 U. S. C. §162a(d)(5) and 25 CFR §§115.801–115.803 (2010)). Because those "narrowly defined disclosure obligations" do not provide Indian tribes with a specific statutory right to disclosure of attorney-client communications relating to trust administration, *ante*, at 22, the majority concludes that the Government has no duty to disclose those communications to the Nation.

The majority's conclusion employs a fundamentally flawed legal premise. We have never held that all of the Government's trust responsibilities to Indians must be set forth expressly in a specific statute or regulation. To the contrary, where, as here, the statutory framework establishes that the relationship between the Government and an Indian tribe "bears the hallmarks of a conventional fiduciary relationship," *Navajo II*, 556 U. S., at __ (slip op., at 14) (internal quotation marks omitted), we have consistently looked to general trust principles to flesh out the Government's fiduciary obligations.

For example, in *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465 (2003), we construed a statute that vested the Government with discretionary authority to "use" trust property for certain purposes as imposing a concomitant duty to preserve improvements that had previously been made to the land. *Id.*, at 475 (quoting 74 Stat. 8). Even though the statute did not "expressly subject the Government to duties of management and conservation," we construed the Government's obligations under the statute by reference to "elementary trust law," which "confirm[ed] the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." 537 U. S., at 475. Similarly, in *Seminole Nation*, we relied on general trust principles to conclude that the Government had a fiduciary duty to prevent misappropriation of tribal trust funds by corrupt members of a tribe, even though no specific statutory or treaty provision expressly imposed such a duty. See 316 U. S., at 296.[8]

————————

[8] To be sure, in decisions involving the jurisdiction of the Court of Federal Claims under the Tucker Act, we have explained that the jurisdictional analysis "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo I*, 537 U. S., at 506. But even assuming *arguendo* that those jurisdictional decisions have relevance here, they do not stand for the proposition that the Government's fiduciary duties are defined exclusively by express statutory provisions. Indeed, those decisions relied specifically on general trust principles to determine whether the relevant statutory scheme permitted a damages remedy, a prerequisite for jurisdiction under the Tucker Act. See, *e.g.*, *Mitchell II*, 463 U. S., at 226 (noting that common-law trust sources establish that "a trustee is accountable in damages for breaches of trust" and that, "[g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties"); see also *Navajo II*, 556 U. S., at ___ (slip op., at 14) (affirming that general "trust principles . . . could play a role in inferring that the trust obligation is enforceable by damages" (internal quotation marks and brackets omitted)).

Accordingly, although the "general 'contours' of the government's obligations" are defined by statute, the "interstices must be filled in through reference to general trust law." *Cobell*, 240 F. 3d, at 1101 (quoting *Mitchell II*, 463 U. S., at 224). This approach accords with our recognition in other trust contexts that "the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime." *Varity Corp.* v. *Howe*, 516 U. S. 489, 504 (1996) (emphasis deleted); cf. *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559, 570 (1985) ("[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility"). Indeed, "[i]f the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose." *Howe*, 516 U. S., at 504.

The majority pays lip service to these precedents, acknowledging that "[w]e have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed." *Ante*, at 13. But despite its assurance that it "will apply common-law trust principles where Congress has indicated it is appropriate to do so," *ante*, at 14, the majority inexplicably rejects the application of common-law trust principles in this case. In doing so, the majority states that "[t]he common law of trusts does not override the specific trust-creating statute and regulations that apply here." *Ante*, at 21–22 (referring to §162a(d)(5) and 25 CFR §§115.801–115.803). That statement evidences the majority's fundamental misunderstanding of the way in which common-law principles operate in the context of a conventional fiduciary relationship.

Contrary to the majority's view, the Government's dis-
closure obligations are not limited solely to the "narrowly
defined disclosure obligations" set forth in §162a(d)(5) and
its implementing regulations, *ante*, at 22; rather, given
that the statutory regime requires the Government to act
as a conventional fiduciary in managing Indian trust
funds, the Government's disclosure obligations include
those of a fiduciary under common-law trust principles.
See *supra*, at 15–17.  Instead of "overrid[ing]" the specific
disclosure duty set forth in §162a(d)(5) and its implement-
ing regulations, general trust principles flesh out the
Government's disclosure obligations under the broader
statutory regime, consistent with its role as a conventional
fiduciary in this context.

This conclusion, moreover, is supported by the plain text
of the very statute cited by the majority.  Section 162a(d),
which was enacted as part of the American Indian Trust
Fund Management Reform Act of 1994 (1994 Act), 108
Stat. 4239, sets forth eight "trust responsibilities of the
United States."  But that provision also specifically states
that the Secretary of the Interior's "proper discharge of the
trust responsibilities of the United States shall include
*(but are not limited to)*" those specified duties.  25 U. S. C.
§162a(d) (emphasis added).  By expressly including the
italicized language, Congress recognized that the Govern-
ment has pre-existing trust responsibilities that arise out
of the broader statutory scheme governing the manage-
ment of Indian trust funds.[9]  Indeed, Title I of the 1994

—————

[9] The majority invokes the canon against superfluity and argues that
the "catchall" phrase (by which it means the "shall include (but are not
limited to)" language) cannot be read to "include a general common-law
duty to disclose all information related to the administration of Indian
trusts" because doing so would "impose general obligations that would
include those specifically enumerated." *Ante*, at 22.  But the flaw in the
majority's argument is that it misperceives the function of the relevant
language.  Rather than serving as a "catchall" provision that affirma-

Act is entitled "*Recognition* of Trust Responsibility," 108 Stat. 4240 (emphasis added), and courts have similarly observed that the Act "recognized and reaffirmed . . . that the government has longstanding and substantial trust obligations to Indians." *Cobell*, 240 F. 3d, at 1098; see also H. R. Rep. No. 103–778, p. 9 (1994) ("The responsibility for management of Indian Trust Funds by the [Government] has been determined through a series of court decisions, treaties, and statutes"). That conclusion accords with common sense as not even the Government argues that it had no disclosure obligations with respect to Indian trust funds prior to the enactment of the 1994 Act.[10]

The majority requires the Nation to "point to a right conferred by statute" to the attorney-client communications at issue, *ante*, at 14, and finding none, denies the

———————

tively "incorporate[s]" common-law trust duties into §162a(d), *ante*, at 22, that language simply makes clear that §162a(d) does not set forth an exhaustive list of the Government's trust responsibilities in managing Indian trust funds; nothing in that language itself imports any substantive obligations into the statute.

[10] The majority also contends that its reading of §162a(d) is supported by a provision in the Indian Claims Limitation Act of 1982 (ICLA), 96 Stat. 1976, which provided that if the Secretary of the Interior rejected a claim for litigation by an Indian claimant, he was required to provide upon request "any nonprivileged research materials or evidence gathered by the United States in the documentation of such claim." §5(b), *id.*, at 1978. According to the majority, this provision reflected Congress' understanding that "the Government retains evidentiary privileges allowing it to withhold information related to trust property from Indian tribes." *Ante*, at 22, n. 11. But this provision cannot bear the weight the majority places on it. Even putting aside the undisputed fact that the ICLA is inapplicable to the claims in this case, the majority's reliance on the ICLA provision fails to recognize that documents subject to the fiduciary exception are, under the "real client" rationale, *per se* nonprivileged. See, *e.g., Mett*, 178 F. 3d, at 1063. Accordingly, if anything, the ICLA's requirement that the Government disclose "nonprivileged" materials to Indian claimants supports the conclusion that Congress intended communications related to trust fund management to be disclosed to Indian tribes.

Nation access to those communications. The upshot of that decision, I fear, may very well be to reinvigorate the position of the dissenting Justices in *White Mountain Apache* and *Mitchell II*, who rejected the use of common-law principles to inform the scope of the Government's fiduciary obligations to Indian tribes. See *White Mountain Apache*, 537 U. S., at 486–487 (THOMAS, J., dissenting); *Mitchell II*, 463 U. S., at 234–235 (Powell, J., dissenting). That approach was wrong when *Mitchell II* was decided nearly 30 years ago, and it is wrong today. Under our governing precedents, common-law trust principles play an important role in defining the Government's fiduciary duties where, as here, the statutory scheme establishes a conventional fiduciary relationship. Applying those principles in this context, I would hold that the fiduciary exception is fully applicable to the communications in this case.[11]

------

[11] The majority's errors are further compounded by its failure to accord proper consideration to the mandamus posture of this case. "This Court repeatedly has observed that the writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations." *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U. S. 271, 289 (1988). "As the writ is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue," *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 380 (2004) (internal quotation marks and citation omitted):

"First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*, at 380–381 (internal quotation marks and citations omitted; alterations deleted).

The majority purports to leave the decision whether to grant mandamus relief to the Federal Circuit, but simultaneously drops a footnote stating that it "assume[s]" that the Court of Federal Claims on remand will "follow [its] holding" that the fiduciary exception is inapplicable

## III

We have described the Federal Government's fiduciary duties toward Indian tribes as consisting of "moral obligations of the highest responsibility and trust," to be fulfilled through conduct "judged by the most exacting fiduciary standards." *Seminole Nation*, 316 U. S., at 297; see also *Mitchell II*, 463 U. S., at 225–226 (collecting cases). The sad and well-documented truth, however, is that the Government has failed to live up to its fiduciary obligations in managing Indian trust fund accounts. See, *e.g.*, *Cobell*, 240 F. 3d, at 1089 ("The General Accounting Office, Interior Department Inspector General, and Office of Management and Budget, among others, have all condemned the mismanagement of [Indian] trust accounts over the past twenty years"); Misplaced Trust 8 ("[T]he [Government's] indifferent supervision and control of the Indian trust funds has consistently resulted in a failure to exercise its responsibility and [to meet] any reasonable expectations of the tribal and individual accountholders, Congress, and taxpayers"); *id.*, at 56 ("[H]ad this type of mismanagement taken place in any other trust arrangements such as Social Security, there would be war").

As Congress has recognized, "[t]he Indian trust fund is more than balance sheets and accounting procedures. These moneys are crucial to the daily operations of native American tribes and a source of income to tens of thousands of native Americans." *Id.*, at 5. Given the history of governmental mismanagement of Indian trust funds, application of the fiduciary exception is, if anything, even more important in this context than in the private trustee

———————

here. *Ante*, at 24, and n. 13. By doing so, the majority virtually assures that the Nation will not be able to use the communications at issue in this litigation, thereby effectively granting extraordinary relief to the Government upon no showing whatsoever that the stringent conditions for mandamus have been met.

context. The majority's refusal to apply the fiduciary exception in this case deprives the Nation—as well as the Indian tribes in the more than 90 cases currently pending in the federal courts involving claims of tribal trust mismanagement, App. to Pet. for Cert. 126a–138a—of highly relevant information going directly to the merits of whether the Government properly fulfilled its fiduciary duties. Its holding only further exacerbates the concerns expressed by many about the lack of adequate oversight and accountability that has marked the Government's handling of Indian trust fund accounts for decades.

But perhaps even more troubling than the majority's refusal to apply the fiduciary exception in this case is its disregard of our established precedents that affirm the central role that common-law trust principles play in defining the Government's fiduciary obligations to Indian tribes. By rejecting the Nation's claim on the ground that it fails to identify a specific statutory right to the communications at issue, the majority effectively embraces an approach espoused by prior dissents that rejects the role of common-law principles altogether in the Indian trust context. Its decision to do so in a case involving only a narrow evidentiary issue is wholly unnecessary and, worse yet, risks further diluting the Government's fiduciary obligations in a manner that Congress clearly did not intend and that would inflict serious harm on the already-frayed relationship between the United States and Indian tribes. Because there is no warrant in precedent or reason for reaching that result, I respectfully dissent.